Machine, No. 1," "Complainant's Exhibit, Defendants' Machine, No. 2," and "Complainant's Exhibit, Defendants' Machine, No. 3." Decree may be drawn accordingly.

---

## THE MINNIE E. KELTON.

(Circuit Court of Appeals, Sixth Circuit.   June 15, 1901.)

### No. 923.

1. SHIPPING—BREACH OF CHARTER—EVIDENCE CONSIDERED.

The master of a steamer, which was required by the terms of a verbal charter to load as much of a cargo of lumber at the charterer's dock as she could safely, with the privilege of completing her cargo at another port, *held* to have been justified in leaving the charterer's dock with about one-third of· a full cargo, where the weather was stormy, the dock exposed to·the seas, and the water so shallow that the steamer began pounding on the bottom before she ceased loading, and the master, after leaving the dock, waited from 5 o'clock in the evening until 11:30 the next day, before leaving, during which time there were no signs of better weather.

2. SAME—FAILURE TO DELIVER CARGO—EVIDENCE OF SHORTAGE.

Where the testimony of the officers and crew of a steamer concurred that all the lumber loaded by a charterer was delivered at the end of a voyage, a shortage·cannot be established by testimony on behalf of the charterer as to the quantity loaded, based entirely on an estimate of the total quantity on the dock, from which the witnesses deducted the quantity carried by two other vessels.

In Admiralty.   Libel for breach of charter party, and cross libel for freight.

The following is the opinion of the district court (SWAN, District Judge):

"The original libel alleges that Godkin, in September, 1894, made a verbal contract of affreightment with the claimants and cross libelants, who are the owners of the steamer Minnie E. Kelton, whereby claimants agreed to send said steamer to libelant's mill at Millekokia, at the north end of Lake·Michigan, there to lade a cargo of lumber for Tonawanda, and 'that the captain of said vessel and crew should take the lumber for the load of said vessel at the rail, and stow it in the hold, and load said vessel with a full load of 700,000 feet of lumber if the depth of water was sufficient to load the vessel to that capacity, and should thereafter carry and deliver said lumber so loaded at Tonawanda, in the state of New York, at the price of $1.87½ per thousand feet, this agreement covering only one cargo of lumber'; that libelant was prepared to deliver said lumber as stipulated, and was ready to perform his part of said agreement on the 4th day of October, 1894, but that the vessel did not arrive at the port of lading until the morning of October 9th, on which day her loading was begun, and continued until five o'clock p. m., when, having laden but 316,000 feet, she went out into the bay, and there remained until 11:30 a. m. the next day, when she left for Cheboygan, Michigan, and proceeded from thence, after completing her loading there, to Tonawanda; that a full load for said steamer would have been about 390,000 feet in addition to the amount that was actually loaded at Millekokia; that said vessel, although her owner and captain were requested so to do, did not finish out her load, or carry·any more lumber from libelant's mill to Tonawanda; that at the time of loading the lumber taken on board said vessel at Millekokia, and for some time thereafter,—much more than a· sufficient time to complete said load to the

full capacity of said vessel,—the weather was fine, and the depth of water in front of libelant's dock was sufficient to enable said vessel to be loaded to her full capacity, and 'libelant at great expense had procured and had sufficient men to handle and deliver said lumber on the rail of said vessel, so there was no difficulty and no reason why said vessel was not loaded to her full capacity, except the action of the master of said vessel in thus refusing to fully load her'; that because of the failure to load and carry lumber to Tonawanda pursuant to said agreement libelant lost the opportunity to sell the same at that place, was deprived of the use of the lumber and of the money invested therein, and of the shipment and sale thereof, for the reason that the same could not be shipped after the default of said vessel before June, 1895, lost the use of his dock for piling other lumber, and was put to the expense of caring for the lumber refused by said vessel, and by reason of said several matters suffered damages in not less than $600. Another item of damage claimed as a consequence of the alleged default of the vessel is a general average charge upon the lumber taken from libelant's dock arising from the grounding of the Minnie E. Kelton near Cheboygan. The amount of this claim is $29.22. Libelant further claims that, pursuant to said contract of affreightment, he hired men to assist in loading the Kelton at Millekokia, and paid them $42.59. A fourth element of damages asserted in the libel is that the steamer failed to deliver at Tonawanda 48,000 feet of libelant's lumber, worth at Tonawanda $18 per thousand. The aggregate of these several claims is about $1,440, for which, with interest, libelant claims a lien upon the Kelton. The respondents deny the several averments of the libel respecting the charter party and the items of damages claimed to have been suffered by libelant, excepting the payment by libelant for the hire of the stevedores at Millekokia. The testimony on the part of the claimants to the terms of the charter is substantially as follows: 'The charter was for the Minnie E. Kelton to go to Godkin's Mill, get a load of lumber as soon as she could conveniently. She was to get what she could, and go to Cheboygan and finish, at $1.87½ per M. She was to get no certain amount, but get what she could; and the captain had the privilege of going to Cheboygan if the weather was so that she could not stay at the dock at Millekokia.' Claimants aver that Godkin stated that there was from 10 to 11 feet of water at the mill dock where the steamer was to lade. The Kelton drew about 3 feet forward and 9½ aft. Her average load was from 735,000 to 750,000 feet of lumber, varying with the dryness of the lumber. With such a load, her draught would be 12 feet. The dock at which she was to load projected into Lake Michigan in a southerly direction about 800 feet. The place afforded no protection from southerly winds, or, indeed, from any wind from southwest to east. The testimony is satisfactory that at the time the steamer stopped loading at the mill dock, there was sufficient sea to render her position somewhat precarious, and she was pounding on the bottom. In the judgment of the master and crew of the steamer, it was unsafe to continue loading, for, as the weather then was, and promised to be by the appearance of the sky and from the barometer, it was imprudent to lie at the dock. The steamer was taken into the bay about 5 o'clock p. m., and there remained at anchor until 11:30 of the next day, when, her master seeing no prospect of the abatement of the wind or sea, she proceeded to Cheboygan to complete her load. There is a sharp conflict between the testimony of libelant and that of Sharpe and Smith, who testify for the claimants, as to the terms and conditions of the charter. All three are equally credible, and there is nothing in the record to impeach or discredit the testimony of either except the mutual contradictions.

"Upon this fundamental issue the finding must be that libelant has not sustained his case by a preponderance of testimony, and necessarily that the contract of affreightment gave the steamer the privilege of completing her lading at Cheboygan, if prevented by the conditions of the weather and the depth of water at Millekokia from taking on a full load at that place. There is also direct contradiction in the testimony as to the depth of water at the dock, the necessity of the steamer's leaving for Cheboygan, and the character of the weather on the day of her departure. I cannot credit the

testimony of the libelant's witnesses as to the depth of water at the dock, but am forced to conclude from admitted facts that there was not sufficient water to enable the steamer to have taken on board half of her ordinary cargo. No time was stipulated in the contract for the vessel to remain or experiment in loading, but, from the exposed character of the place, the lateness of the season, and the apparent probability of the continuance of the storm which compelled her to haul out from the dock, it cannot be said that the master of the steamer acted arbitrarily, or in bad faith, in availing himself of the privilege of proceeding to Cheboygan to complete his load. He had found it impossible, because of the lack of water at the dock, to back his vessel into position for loading, which would have enabled him, in case of a sudden storm, to promptly run out to an anchorage. He was compelled to go in bow first into the dock, and when he had loaded about one-third of the intended cargo the sea compelled him to run out into the bay. The testimony of libelant's own witness Fountain, the keeper of the lighthouse, supplemented by his daily records, made contemporaneously with the events they narrate, show that on October 10th it would have been impossible for the Kelton even to lie at the dock, because the sea was running so high. This corroborates the testimony of the crew of the Kelton to the same point. The proofs satisfy me that the Kelton had no alternative but to leave the dock, notwithstanding the testimony of libelant's witnesses, who were men of no nautical experience, and unqualified to judge of the effect of the sea upon the steamer lying at the dock. The proofs also show that the master did not cease loading until the Kelton had commenced to pound upon the bottom. The conditions of wind, weather, and water at the place of loading fairly justified the master in acting upon the right given by the charter (according to the testimony of Sharpe and Smith) of completing his load at Cheboygan. He was not bound to await for an indefinite period the subsidence of the sea, as that could not be forecast. The master testified that his instructions from the owner of the Kelton required him to complete his load at Cheboygan if prevented by the weather from lading at Millekokia. While this is not evidence of the terms of the contract, it is admissible to show that the master acted in good faith in proceeding to Cheboygan.

"With respect to the claim for 48,000 feet of lumber alleged to have been laden on the Kelton, but not delivered at Tonawanda to the consignees, the proofs greatly preponderate that all the lumber laden on the Kelton at the mill dock was stowed in the hold of the Kelton, properly marked to distinguish it from that laden at Cheboygan, and was duly delivered at Tonawanda. The claim for the deficiency rests solely upon estimates made by libelant and his employés of the amount laden on the Kelton. These estimates are, in their turn, based upon the cargoes laden on the Swallow and another vessel later in the season, and on estimates of the amount of lumber on the dock before the Kelton commenced loading. These estimates scarcely rise to the dignity of evidence, and are inherently altogether too uncertain and conjectural to support the charge of nondelivery of cargo. The consignees measured the lumber delivered by the Kelton for libelant at Tonawanda, and ascertained it to be about 262,000 feet. The testimony of the crew of the Kelton concurs that all that was laden at libelant's dock was delivered. That satisfied the contract of affreightment. Law v. Botsford (D. C.) 26 Fed. 651. This item, therefore, must also be disallowed.

"The claim for reimbursement for the general average assessment upon the libelant's lumber, occasioned by the expenses of grounding near Cheboygan, cannot be sustained. It is not disputed that the expenses incurred were of the nature of general average, and their reasonableness is not contested. No reason is perceived for exempting libelant's part of the cargo of the Kelton from its portion of this expense, as both ship and cargo were presumptively exposed to a common peril, which was averted by the measures taken. It is urged that, had the captain completed her lading at Millekokia, the necessity for these expenditures never would have arisen, but this argument assumes that the vessel was not justified in leaving Millekokia when she did, and is, therefore, irreconcilable with the conclusions reached upon that question.

"The item of $12.59 paid by libelant at Millekokia and the men employed in assisting to lade the vessel at that place, should be allowed. The libelant paid it in good faith, and has not been reimbursed.

"The single remaining question is founded upon the cross libel, which claims freight at $1.87½ per M. on 261,360 feet laden at Millekokia for libelant, and delivered to his consignees at Tonawanda. The conclusions reached upon the original libel require the allowance to the cross libelants of the freight thus earned by the Kelton. The amount of this freight is $490.05, which, with interest at six per cent. from November 1st to September 1st, must be allowed the libelant, less $42.50, the amount paid by Godkin as above stated, with interest at six per cent. for the same period.

"The costs should be apportioned between the parties, each having partially prevailed, in the proportion of their respective recoveries. Approximately, the cross libelants are entitled to recover eleven-twelfths of their costs and the libelant one-twelfth."

Thomas A. E. Weadock, for appellant.

H. M. Gillett, for appellee.

Before LURTON and SEVERENS, Circuit Judges, and CLARK, District Judge.

PER CURIAM. Libel for a breach of a maritime contract of affreightment, and cross libel for freight earned. Affirmed upon the opinion of the district court.

---

### THE ARCTIC BIRD.

### A CERTAIN BARGE.

#### (District Court, N. D. California. May 27, 1901.)

1. SHIPPING—LOSS OF CARGO—UNSEAWORTHINESS.

The sinking of a barge, with her cargo, six hours after starting on a voyage, having been towed in smooth water during that time, cannot be attributed to a "peril of the sea," which has reference to such extraordinary perils as cannot be guarded against by the ordinary exertions of human skill and prudence, but must be presumed to have resulted from unseaworthiness at the beginning of the voyage.

2. SAME—CONTRACT OF CARRIAGE—BILL OF LADING.

Where goods were delivered to and laden upon a vessel for shipment, and a receipt given therefor, under a written contract for their carriage between the shipper and carrier, the terms of such contract cannot be changed, and new conditions and limitations favorable to the carrier added, by a bill of lading subsequently delivered by it to the shipper, and accepted by him without reading, unless it is shown that his attention was called to such changes, so that he may be presumed to have assented thereto.

3. SAME—LOSS OF GOODS IN SHIPMENT—MEASURE OF DAMAGES.

The measure of damages for goods lost in shipment, on which the freight had been prepaid, is their market value at the place of destination at the time when they should have been delivered, with interest from that date, and, in the absence of proof of such value, it will be presumed to have been their value at the place of shipment, with the freight added.

4. SAME—CONDITION OF LIABILITY—TIME FOR PRESENTING CLAIM.

A carrier of goods has the right to provide by contract that any claim for damages on account of loss or injury to the goods in shipment shall be presented within a reasonable time therein fixed, as a condition precedent to the right to maintain an action thereon, and a